**Affirmed as Modified; Opinion Filed August 9, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00595-CR

**TADARROWL DERONE CARSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F13-57494-Y**

## MEMORANDUM OPINION

Before Justices Myers, Stoddart, and Whitehill
Opinion by Justice Myers

A jury convicted appellant Tadarrowl Derone Carson of failing to stop and render aid but was unable to reach a unanimous verdict on a related charge of aggravated assault with a deadly weapon. The trial court declared a mistrial on that case and proceeded to punishment on the failure to stop and render aid case, where the jury assessed punishment at ten years' imprisonment and a $10,000 fine. In two points of error, appellant argues the evidence is insufficient to support the conviction and the trial court erred by admitting extraneous offense evidence. The State brings a cross-point that the judgment should be modified to accurately reflect the statute appellant was charged with violating and the jury's assessment of a $10,000 fine. As modified, we affirm.

DISCUSSION

## 1. Sufficiency of the Evidence

In his first point of error, appellant contends the evidence is legally insufficient to support appellant's conviction because the State failed to prove beyond a reasonable doubt that appellant operated the motor vehicle that was involved in the accident. In reviewing the sufficiency of the evidence, the court considers all the evidence in the light most favorable to the jury's verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The trier of fact is the sole judge of the weight and credibility given to witness testimony. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). We may not act as the "thirteenth juror" and reweigh the jury's determinations of the weight or credibility of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The standard is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The State need not disprove all reasonable hypotheses that are inconsistent with the defendant's guilt. *Id*. Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Id*.; *see also Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007).

The indictment alleged that on or about July 1, 2013, in Dallas County, Texas, appellant did

> then and there intentionally and knowingly operate a vehicle which became
> involved in an accident, said accident resulting in SERIOUS BODILY INJURY
> to EBONY HICKS, hereinafter called complainant, and the said defendant did
> thereafter, knowing said accident had occurred, intentionally and knowingly fail
> to immediately stop the said vehicle at or close to, and immediately return the said
> vehicle to, and remain at, the scene of the said accident and give the said

defendant's name and address, the registration number of said vehicle, and the name of the said defendant's motor vehicle liability insurer to said complainant, and the operator and occupant of, and person attending, the vehicle involved in said accident with the said defendant, and the said defendant intentionally and knowingly failed to show upon request the said defendant's available driver's license to said complainant, and the operator and occupant of, and person attending, the vehicle involved in said accident with the said defendant, and the said defendant did intentionally and knowingly fail to provide to said complainant reasonable assistance, including transporting and making arrangements for transporting said complainant to a physician and hospital when it was apparent that treatment was necessary, and when the complainant requested the transportation[.]

The indictment is based on sections 550.021 and 550.023 of the Texas Transportation Code. Under section 550.021, the operator of a vehicle involved in an accident that results or is reasonably likely to result in injury to or death of a person shall:

(1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

(2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;

(3) immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that person requires aid; and

(4) remain at the scene of the accident until the operator complies with the requirements of Section 550.023.

TEX. TRANSP. CODE ANN. § 550.021. Under Section 550.023, the operator of a vehicle involved in an accident resulting in the injury or death of a person or damage to a vehicle that is driven or attended by a person shall:

(1) give the operator's name and address, the registration number of the vehicle the operator was driving, and the name of the operator's motor vehicle liability insurer to any person injured or the operator or occupant of or person attending a vehicle involved in the collision;

(2) if requested and available, show the operator's driver's license to a person described by Subdivision (1); and

(3) provide any person injured in the accident reasonable assistance, including transporting or making arrangements for transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation.

*Id.* § 550.023.

The evidence at trial showed that on the morning of July 1, 2013, Sonya Smith, a certified medical assistant, was driving to work at Baylor Hospital. While stopped at a red light at the intersection of Northwest Highway and Garland Road, which was along a route she traveled "almost every day," she noticed "blaring" loud music and smelled a strong odor of marijuana coming from the car next to her. She also saw that the driver was smoking a "blunt," which is a hollowed out cigar filled with marijuana. Smith testified that she "was offended of smelling marijuana and loud music on my way to work." She did not get a good look at the driver's face but described him as black; she did not notice what he was wearing.

When the light turned green, the car next to Smith "peeled off so fast" that Smith feared he would hit someone if he did not slow down. She lost sight of the car for approximately thirty seconds because of a slight curve in the road. Less than a minute later, she heard a "loud boom." As she passed the turn in the road, Smith could see that the car that had been next to her at the stoplight had collided with another vehicle and was "going on the opposite side of the road sideways, sliding down." The other vehicle "veered the other way." Smith pulled over and ran towards the second car. She recalled that the car "was mangled so bad" and that the driver was severely injured and bleeding "pretty heavily on her legs." Her injuries appeared to be so severe Smith "thought she probably wouldn't make it." There was no one else in the second vehicle.

The driver of the second car, Ebony Hicks, also a medical assistant, testified that on the morning of July 1, 2013, she was following her normal driving pattern to work. At a little after 8 a.m., her vehicle, a 2006 Chevy Malibu, was stopped at a red light at Barnes Ridge and Garland Road. When the light turned green, she turned left onto Garland Road. Hicks was not sure whether she was able to complete the turn, however, because the next thing she remembered was

being woken up in the back seat of her car by Smith and an unidentified Hispanic male;[1] they told Hicks that she had been in an accident. Hicks testified that she had buckled her seatbelt that morning and that she normally used her seatbelt.

Hicks was transported by ambulance to Baylor Hospital, where she had x-rays, blood work, CT scans, and other tests. She was in the ICU for three days and in the hospital for seven days. She suffered broken L-4 and L-5 bones in her spine, a lacerated kidney, a ruptured spleen, and internal bleeding. Hicks did not see the person who hit her. She did not know the condition of the vehicle that hit her and did not know if that person was injured. She also did not know if that person had attempted to approach her vehicle at any point.

Michael Wilson testified that he was in front of a car dealership on Garland Road on the morning of July 1, 2013, waiting for it to open. The dealership usually opened at 9 o'clock and he arrived at the location at about 8:00, 8:15, 8:30 a.m., "somewhere in that area." As he waited, Wilson heard a noise that "sounded like a bomb going off." He did not see the collision but when he heard the noise he looked up and saw a car that had "no front end on it" rolling up in front of him. A black male wearing dark shorts and a top that was "maybe" white jumped out of the car. As the man got out of the car, Wilson could see smoke emitting from the vehicle that "was like a marijuana smell or something." Wilson had no doubt the man "was in shock" and "knew there was something wrong with him," although he "didn't know exactly what." Wilson tried to convince him to sit down because he might be injured, but the man said, "No, I got to go, I got to go," and "[t]ook off running."

Wilson gave a description of that man to the police and indicated the direction in which he ran. Wilson also noticed a "crack pipe" on the driver's side floorboard of the vehicle while the police were searching it. Wilson was unable to identify appellant at trial; asked if the person

---

[1] The Hispanic male did not testify at trial.

he saw that day was in the courtroom, Wilson said, "I'm not for sure."

Dallas Police Officer Stanley Reed was the first officer to arrive at the scene. He testified that he was on patrol the morning of July 1, 2013, and had just finished working an accident at Garland and Eason, when he received a dispatch at around 8 a.m. regarding a major accident at the intersection of Garland Road and Barnes Ridge, only a quarter of a mile from his location. It took Officer Reed less than two minutes to reach the accident scene.

The first thing he noticed when he arrived at the scene was the suspect's vehicle, a Chrysler, on the northbound side of the road, up against the outside curb. He could see the other car, a black Chevy, perhaps a hundred feet away on the southbound side of the road, up against the southbound curb. Officer Reed tried to talk to the driver of the Chevy but she "was in a lot of pain" and "was having difficulty breathing." She told him that the last thing she remembered was that "she came off of . . . Barnes Ridge and was going to turn onto Garland Road and go south." The driver of the Chevy, Smith, described the Chrysler as driving at a high rate of speed and said it ran the red light at Barnes Ridge. Reed also spoke to Hicks, who indicated she had a green light. The driver of the Chrysler was not at the crash scene. The officer took the description of the suspect he had been given—a black male with a medium complexion, short hair, a gray or white t-shirt, and black shorts—and "put it out over the radio." It was the officer's opinion that the Chrysler was being driven at an excessive and unreasonable speed. Officer Reed testified that he searched the Chrysler at the crash scene and found a crack pipe on the driver's side floorboard. He did not perform any testing on the pipe and did not recommend any drug charges.

After the suspect's description was broadcast over the police radio, other officers started looking for him. One of those officers was Dallas Police Officer Lorenzo Carranza, who testified that he had just started his normal day shift on July 1, 2013, when, at around 8:05 or

–6–

8:06 a.m., he received notification that there had been a car wreck. Carranza testified that his normal role at a crash scene was to block traffic, get witness information, and talk to any possible witnesses. On this occasion, while in route to the crash scene, he received information that the driver of one of the cars that had been involved in the crash had fled the location and that citizens were chasing him. He was receiving updates via the radio on the suspect's last known location and attempted to get ahead of the suspect in order to apprehend him. Officer Carranza was flagged down by a witness who told him he had just seen a man who looked like he was running from the police. The officer alerted other officers over the radio that there had been a sighting of the suspect; he was limping and was headed in a northbound direction.

Continuing his search, Officer Carranza eventually drove up Sunland and turned onto Fernald Avenue. As he passed Loch Ness Street, some workers for a landscaping company told Carranza they saw a person running in the direction of Loch Ness and thought the police were looking for him. He drove over to Loch Ness Street and saw a person that matched the suspect's description walking at a fast pace away from the direction of where the accident had occurred. The man was a black male who appeared to be trying to catch his breath, was sweaty, and wore a grey or white t-shirt and black shorts. His shoes were covered in mud, as were the rest of his clothes. Because the man matched the description of the suspect, Carranza detained him, handcuffed him, patted him down (finding no weapons), and placed him in the back of the patrol car. The officer then radioed his dispatcher and the other officers to notify them he had detained a person that matched the suspect's description.

The officer ran the license plate information on the suspect's vehicle and found it belonged to the Hertz rental car company. Carranza contacted Hertz, which provided him with the name of the woman who had leased the car. He asked the man he had detained if he knew that person and the man replied that she was his fiancée. Carranza told the man why he was

–7–

detained, explaining there had been an accident and "that the person at the accident fled the location." He asked the man if he was the driver of the car, and the man denied it and said no, he never drove that car. The officer also asked him if he knew about the vehicle, and the man said it belonged to his fiancée. Officer Carranza identified appellant in court as the man he had detained.

The officer also testified that he found a phone when he patted down appellant for weapons. Officer Carranza recalled that, while appellant was detained, there was "a person that [kept] on calling and calling and calling" appellant. Carranza answered the phone and the female caller informed the officer that the person he had detained was her fiancée. He asked her about the car and she said her fiancée was driving it. The officer took appellant to the police substation. After he finished his work at the accident scene, Officer Reed went to the substation, took custody of appellant, and transported him to the jail. At trial, Officer Reed identified appellant as the person he drove to the jail that day.

Appellant argues the State failed to prove beyond a reasonable doubt he was the person who committed the charged offense because no reasonable factfinder could have inferred from the evidence that he was the person who exited the car in front of Wilson. Appellant focuses on two alleged inadequacies in the evidence: (1) the description of the driver that Officer Carranza relied on to apprehend appellant was insufficiently detailed, and (2) no witness who observed appellant operate his vehicle identified him in open court as the driver. Neither argument is convincing.

The identity of the perpetrator of an offense can be established through direct or circumstantial evidence and does not need to be proven by eyewitness identification. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986). In addition to the description of the driver that Officer Carranza relied on to apprehend appellant, there was other evidence that bolstered

appellant's identity as the driver who fled the accident scene.  Carranza testified that he searched for the suspect using the description given over the radio and the location and directional information he had received from citizens.   He also testified that when he found appellant, he was at the location given by witnesses and was seen walking at a fast pace in a direction away from the scene of the accident.  His clothes and shoes were covered with mud and appellant was sweating and appeared to be trying to catch his breath.  All of these factors—the clothing appellant was wearing, his location and direction of travel, and his appearance and apparent physical exhaustion—provided credible evidence that appellant and the man seen fleeing from the scene of the accident were the same person.

Furthermore, Officer Carranza testified that he checked the license plate on the Chrysler and found that the vehicle belonged to the Hertz car rental company.  He called Hertz to find the renter of the vehicle and was given a woman's name.  Appellant told the officer that the woman was his fiancée and that she had rented the vehicle.  However, Carranza also testified that while searching appellant he found a phone that was being called repeatedly by a woman who told the officer that the person he had detained was her fiancé.  When asked about the car, the woman said her fiancée was driving it.

Appellant asserts that "[t]he State's argument that [a]ppellant's clothes were muddy, and, therefore, he was the person who committed the charged offense is tenuous and not a reasonable inference from the evidence presented at trial."  But the mud on appellant's clothes was only one part of the evidence relied on by the State.  The testimony from Officer Carranza regarding the reason for the muddy clothes was provided on cross-examination.  When asked by the defense whether there was "[a]ny indication where the mud would have come from," based on what he "knew about the situation," Carranza replied, "That whole area is wooded and lots of places where he could have gotten mud from running."

The court of criminal appeals has cautioned that we must not engage in a "divide and conquer" approach to the evidence, separating each piece of evidence offered to support a defendant's conviction and speculating on evidence the State did not present. *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). Instead, we must consider the cumulative force of all the evidence, including improperly admitted evidence. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). When the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the prosecution and defer to that determination. *Id*.

Based on the cumulative force of the evidence presented, taken as a whole and viewed in the light most favorable to the verdict, we conclude a rational trier of fact could have found that the person who fled the scene of the accident was the same person later apprehended by Officer Carranza. Accordingly, the evidence is sufficient to support appellant's conviction. We overrule appellant's first issue.

## 2. Extraneous Offense Evidence

In his second issue, appellant argues that the trial court abused its discretion by permitting the State to introduce extraneous offense evidence during the guilt/innocence portion of the trial.

The trial court had granted appellant's written pretrial motion in limine requesting that the court order the State to refrain from making any direct or indirect reference to extraneous offense or misconduct evidence not alleged in the indictment without first holding a hearing to determine the admissibility of that evidence. Just before the first witness was called, during a hearing held outside the jury's presence, appellant requested that the trial court exclude evidence related to a crack pipe inside the vehicle and the smell of marijuana. Appellant argued this evidence was more prejudicial than probative under rule of evidence 403. The State argued the evidence of a smell of marijuana emitting from the vehicle and the crack pipe were relevant to

show intent and whether appellant was reckless. Appellant also argued that the sole purpose of introducing this evidence was to prejudice the jury. Denying appellant's request, the trial court ruled as follows:

> The evidence that the State seeks to introduce is res gestae and inextricably intertwined with the charged offense. Even [if] it was not although it is prejudicial it is not more prejudicial than probative.
>
> Given that, the evidence indicates that potentially the defendant was driving recklessly because he was under the influence of those narcotics, and it's that that makes it relevant.
>
> Only the jury can decide whether there is any type of linkage there or not. So your objection is overruled.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its decision to admit or exclude the evidence lies outside the zone of reasonable disagreement. *See Martinez*, 327 S.W.3d at 736; *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We will uphold the trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz*, 279 S.W.3d at 344.

Texas Rule of Evidence 403 provides that otherwise relevant and admissible evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. In considering a rule 403 challenge, courts balance (1) the inherent probative force of the evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation, with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, commonly, an emotional one, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to

–11–

be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *see also Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012). We should reverse a trial court's balancing determination "rarely and only after a clear abuse of discretion." *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990).

Applying the rule 403 factors, the first two favor admissibility because the evidence of marijuana use and the drug paraphernalia found in the vehicle were probative of appellant's identity and state of mind. Smith testified that she lost sight of the vehicle as it drove around a curb. The evidence relating to the smell of marijuana and the marijuana smoke emitting from the vehicle helped establish that the vehicle Smith saw prior to the accident and the vehicle Wilson observed after the accident were the same vehicle. As for the crack pipe, the mere presence of a crack pipe in the vehicle would not show appellant's identity as the driver, but the evidence of the driver's marijuana use and the drug paraphernalia in the vehicle were probative of his state of mind at the time of the accident. The State had a need for such evidence to rebut appellant's argument that the State had failed to prove reckless behavior. As for the third factor, the prejudicial impact was minimal and nothing in the record indicates that admitting the evidence would be so inherently inflammatory that it would tend to elicit an emotional response and impress a jury in some "irrational and indelible way," or "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *See Old Chief v. United States*, 519 U.S. 172, 180 (1997); *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002). The fourth and sixth factors concern the tendency of the evidence to confuse or distract the jury from the main issues and the amount of time consumed by the presentation of the evidence. *See*

–12–

*Gigliobianco*, 210 S.W.3d at 641. These factors likewise favor admissibility because the evidence in question did not take a significant amount of time at trial to develop. The fifth factor concerns a tendency of an item of evidence to be given undue weight by a jury that has not been properly equipped to evaluate the probative force of the evidence. "For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.* Evidence related to a crack pipe found inside the vehicle and the marijuana use was not prone to such a tendency because it concerned matters that were easily understandable by a jury. Moreover, the trial court included a limiting instruction in the jury charge.[2] Thus, the fifth factor also weighs in favor of admission. For all of these reasons, we conclude the probative value of the complained-of evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Gigliobianco*, 210 S.W.3d at 641–42. We overrule appellant's second issue.

### 3. State's Cross-Point

The State raises a cross-point in which it argues that the judgment should be modified to accurately reflect the statute that appellant was charged with violating and the jury's assessment of a 10,000 fine.

Appellant was indicted for and found guilty of failure to stop and render aid. *See* TEX. TRANSP. CODE ANN. § 550.021. The judgment, however, lists the "Statute for Offense" as "50.021 Penal Code." There is no such provision in the Penal Code. The record also shows the jury assessed a $10,000 fine as part of appellant's punishment for this offense. The fine amount

---

[2] The instruction was as follows:

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses, if any, other than the offense, if any, alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, if any, of the defendant, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

–13–

was written on the verdict form by the presiding juror in the punishment phase of trial, and the trial court read the fine into the record. But the fine is omitted from the judgment, the fine portion of the judgment having been left blank.

Where the record contains the necessary information to do so, the court on appeal has the authority to modify incorrect judgments. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Abron v. State*, 997 S.W.2d 281, 282 (Tex. App.—Dallas 1998, pet. ref'd). "This Court has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so, or make any appropriate order as the law and the nature of the case may require." *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

Accordingly, we sustain the State's cross-point. The judgment will be modified to reflect that the "Statute for Offense" is section 550.021 of the Texas Transportation Code and that the jury assessed a $10,000 fine as part of appellant's punishment for this offense.

As modified, we affirm the trial court's judgment.


/ Lana Myers/
LANA MYERS
JUSTICE


Do Not Publish
TEX. R. APP. P. 47
140595F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

TADARROWL DERONE CARSON,
Appellant

No. 05-14-00595-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 7, Dallas County, Texas
Trial Court Cause No. F13-57494-Y.
Opinion delivered by Justice Myers. Justices
Stoddart and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Statute for Offense:  50.021 Penal Code" should be changed to "Statute for Offense:  550.021 Transportation Code."

"Fine: $ 0" should be changed to "Fine: $10,000."

As **REFORMED**, the judgment is **AFFIRMED**.  We direct the trial court to prepare a new judgment that reflects these modifications.

Judgment entered this 9th day of August, 2016.